FILED

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
NORTHEASTERN DIVISION

99 FEB -8 PM 3:0

N.D. OF ALABAMA

JACK SIMON                          )
                                    )
        Plaintiff,                  )
                                    )
vs.                                 )    Civil Action No. CV-97-S-2799-NE
                                    )
CHRYSLER CORPORATION;               )
and PEI ELECTRONICS, INC.,          )
                                    )        ENTERED
        Defendants.                 )
                                         FEB 0 8 1999

## MEMORANDUM OPINION

Plaintiff, Jack Simon, commenced this action on October 22, 1997, alleging claims under the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 et seq.  Simon alleges that "[d]efendants willfully discriminated against [him] in discharge, layoff, failure to transfer, failure to re-hire, failure to recall and other terms, conditions and privileges of employment because of his age."  (Amended complaint, Doc. No. 2, ¶ 16.)  Simon seeks declaratory and injunctive relief, reinstatement, back-pay, front-pay, reasonable value of benefits lost, liquidated damages, attorney's fees, and costs.  The action presently is before the court on defendants' motions for summary judgment.

## I. SUMMARY JUDGMENT STANDARD

Federal Rule of Civil Procedure 56(c) provides that summary judgment not only is proper, but "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. ..." (Emphasis added.) The movant bears the initial burden of showing the court, by reference to materials on file, that no genuine issues of material fact exist to be decided at trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Clark v. Coats & Clark, Inc.*, 929 F.2d 604 (11th Cir. 1991). The moving party discharges this burden by "showing" or "pointing out" to the court that there is an absence of evidence to support the non-moving party's case. *Jeffery v. Sarasota White Sox, Inc.*, 64 F.3d 590, 593 (11th Cir. 1995)(*per curiam*). Rule 56 permits the movant to discharge this burden with or without supporting affidavits. *See Celotex*, 477 U.S. at 324, 106 S.Ct. at 2553. When the moving party has discharged its burden, the non-movant must go beyond the pleadings and designate specific

2

facts showing there is a genuine issue for trial.  *See Jeffery*, 64
F.3d at 593.

     In deciding whether the moving party has met its burden, the
court is obligated to draw all inferences from the evidence
presented in the light most favorable to the non-movant and, also,
to resolve all reasonable doubts in that party's favor.  *See Spence
v. Zimmerman*, 873 F.2d 256 (11th Cir. 1989).  Inferences in favor
of the non-movant are not unqualified, however.  "Mere general
allegations which do not reveal detailed and precise facts will not
prevent the award of summary judgment."  *Resolution Trust Corp. v.
Dunmar Corp.*, 43 F.3d 587, 592 (11th Cir. 1995) (citation omitted).
Moreover, evidence that is merely colorable, *see Brown v. City of
Clewiston*, 848 F.2d 1534, 1537 (11th Cir. 1988), conclusory, *see
Peppers v. Coates*, 887 F.2d 1493, 1498 (11th Cir. 1989), or
conjectural, does not create a genuine issue of material fact.

     Thus, if a reasonable fact finder evaluating the evidence
<u>could</u> draw more than one inference from the facts, and if that
inference introduces a genuine issue of material fact, then the
court should not grant summary judgment.  *See Augusta Iron & Steel
Works v. Employers Ins. of Wausau*, 835 F.2d 855, 856 (11th Cir.
1988).  A "genuine" dispute about a material fact exists if the

                                   3

"evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Jeffery*, 64 F.3d at 594 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986)). The bottom line is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52, 106 S.Ct. at 2512.

With the foregoing standards in mind, the following facts either are not disputed, or are stated in a light most favorable to plaintiff.

## II. FACTS

Jack Simon was hired in October of 1989 as a Program Administration Manager by Pentastar Electronics, Inc. ("Pentastar"), a division of defendant Chrysler Corporation ("Chrysler"). Pentastar was a government defense contractor. In the face of financial difficulties with Pentastar, Chrysler attempted to sell this division. Chrysler's efforts were unsuccessful, and it considered closing Pentastar. The president of Pentastar, Jewell Toney, then organized a group of employees and other investors which purchased Pentastar from Chrysler in January,

4

1997, and continued to operate the business under the name PEI
Electronics, Inc. ("PEI").

As a Program Administration Manager at Pentastar, Simon
supervised the work of a number of employees.[1]  As a supervisor,
Simon delegated work to these employees, and monitored their
performance.  Simon was supervised by Michol Fletcher, Manager of
the Program Management Office.  Fletcher, in turn, reported to
Jewell Toney.  Simon was born on April 9, 1938; Fletcher was born
on May 1, 1945; and Toney was born March 8, 1933.

Simon's duties consisted primarily of estimating costs
(material and labor) of projects for which Pentastar considered
placing bids.  Simon also monitored the execution of awarded
contracts to ensure the actual expenditures matched those in the
proposals.  To this end, Simon would "support the program managers
through having some of the people do [cost schedule status reports
for them]."  (Plaintiff's deposition, at 43.)  Simon received a
salary of $76,320.  Simon served in this capacity until his layoff
in May 31, 1996.  Throughout his employment at Pentastar, Simon

---

[1] There is some discrepancy in the evidence as to exactly whom and how many
employees Simon supervised.  *Compare* (Evans declaration, ¶ 1) *and* (Plaintiff's
deposition, at 46-50) *with* (Fletcher declaration, ¶ 7.)  It is undisputed that
he supervised at least four employees:  Leland Cox, Severin Breding, Lisa
Breding, and Cathy Molnar.  Simon's involvement with Steve Calvert, Stan Evans,
and Glauda Arthur is unclear.

5

never received a performance evaluation that indicated his work was less than satisfactory.

## A.   Events Leading up to Layoff

Pentastar began to experience a prolonged economic downturn in 1994.  Defendant PEI (Pentastar's successor) cites a decrease in federal funding for defense expenditures and the accompanying decrease in new defense contracts available to Pentastar.  (See PEI's brief, at 4.)   PEI also cites "cost overruns" in the execution of contracts as a primary reason for the fiscal misfortune.

Pentastar historically divided its labor costs into two types: (1) "touch labor," referring to employees directly involved in making a product; and (2) "support labor," referring to employees who provided support and administrative services to touch labor employees.  Simon's position was classified as support labor. During this economic downturn, Pentastar's costs for support labor significantly exceeded the amount proposed in the budgets for existing contracts.   (See Fletcher declaration, ¶ 8; Fletcher deposition, at 38-41, and exhibit 1.)

Michol Fletcher increased his efforts at monitoring the execution of contracts within the division he supervised.  After discussions with President Toney, Fletcher ultimately decided that

6

reorganization of his department was necessary to stem the receding economic tide. In the face of unrelenting cost overruns, Fletcher repeatedly recommended the layoff of at least two support labor employees and the elimination of at least Simon's support labor position, beginning in November of 1994. Fletcher planned to assume the supervisory duties of that position. Due to circumstances beyond the control of Fletcher or Simon, the proposals were not acted upon until May 31, 1996. In his proposal, Fletcher also recommended the layoff of two other employees in his division: Severin Breding, who was over forty years old, and Karen Cotton, who was thirty-six. On the heels of this layoff, Pentastar was forced to layoff sixteen to eighteen more employees in early June of 1996, because the United States Army issued stop-work orders for two of the company's largest defense contracts.

## B.   Activities During the Layoff Period

### 1.   Jack Simon

Plaintiff Jack Simon was laid off for a period of seven months and ten days, beginning May 31, 1996 and ending January 10, 1997. Simon interviewed for a position at Accustar, Inc., another subsidiary of Chrysler. Accustar hired a thirty-eight year old instead.

7

Simon's other activities related to employment or the search therefor during this period are in dispute, and need not be addressed for purposes of the present motions.

## 2. Defendants and Pentastar

Michol Fletcher assumed the duties of supervising the cost estimating group, as he had planned. In October 1996, however, Fletcher took a medical leave of absence. Medical complications forced this leave to last longer than expected, keeping Fletcher out of work until January 3, 1997. After a short period during which Jim Raymond assumed the duties of directing the Program Management Office, Fletcher assigned Glauda Arthur to a position overseeing the cost estimating group. This assignment was intended to be temporary, lasting until Fletcher's return.

Chrysler had attempted to sell Pentastar for several years. Potential buyers of Pentastar expressed concern over the age of the workforce. Upon learning of Chrysler's impending closure of Pentastar failing a timely sell, Toney organized a group of investors that purchased Pentastar and continued its operations under the name PEI Electronics, Inc. The sales contract required PEI to extend a recall to all Pentastar employees who had been laid off.

8

## C.    Recall

In early 1997 and shortly after the purchase, PEI reorganized the Program Management and Program Administration offices. Glauda Arthur became the Manager of Program Administration, supervising the cost estimating employees. PEI contends that this supervisory duty is the only similarity to Simon's former position. Allegedly, Arthur also supervises employees who perform various other job functions and, in addition, actually performs the many job functions that these employees perform. Nevertheless, for purposes of this motion only, Arthur occupies Simon's former position.

Plaintiff Simon accepted the offer of recall to begin work on PEI's first day of operation. Simon was placed into the position of Program Manager where he has remained employed. Simon's duties include negotiating contracts and overseeing their execution. Simon has no supervisory authority as a Program Manager, and he reports to a senior Program Manager. Simon earned a salary of $76,320 upon his recall, the same salary he earned at the time he was laid off. Simon received a pay raise within several months of his recall, and presently earns a salary of $80,132.

Simon describes the situations of four other employees who were replaced by younger persons. None of such employees who had supervisory positions was recalled into a position with supervisory

9

duties.  (*See* declaration of Donald G. Hicks, ¶ 5.)  Furthermore, Simon cites the declaration of Donald G. Hicks for a remark by Paul Gulbis, a Vice President of Chrysler, made upon returning from the office of President Toney.  Hicks declares as follows:

> In my office on December 16, 1996, Gulbis was returning from the office of Jewell Toney to request that a drafting checker be offered a job.  In my presence, Gulbis informed Mr. Walt Buie, the head of the Mechanical Engineering Department, that a contracting job would not be forthcoming for Cliff Beaty.  Beaty was a sixty year old man who had accepted a retirement package, but who was still employed as a Chrysler Corporation checker in Buie's department.  In referring to Beaty, Gulbis stated, "He said he is too God-Damn old, and I want a younger person in that position."

(Hicks declaration, ¶ 6.)

Jack Simon filed a charge of age discrimination with the Equal Employment Opportunity Commission on November 20, 1996.

## III. DISCUSSION

### A:  Standard For Evaluation Of ADEA Claims

In ADEA cases, the plaintiff has the ultimate burden of proving that age was a determinative factor in the employer's adverse employment decision.  *See, e.g., Verbraeken v. Westinghouse Electric Corporation*, 881 F.2d 1041, 1045 (11th Cir. 1989).  Initially, the plaintiff must establish that age was a determining

10

factor in the employer's decision with direct evidence,[2] circumstantial evidence, or statistical evidence. *E.g.*, *Alphin v. Sears, Roebuck & Company*, 940 F.2d 1497, 1500 (11th Cir. 1991).

Plaintiff presents no direct evidence of discrimination.[3] The court, therefore, will proceed with the analysis for circumstantial evidence.

To avoid summary judgment on an age discrimination claim, a plaintiff relying on circumstantial evidence must comply with the framework created for disparate treatment claims defined by the Supreme Court in a series of decisions rendered over a period of twenty years, beginning with *McDonnell Douglas Corporation v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), then elaborated in *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981), and finally elucidated in *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 113

---

[2] "Only the most blatant remarks, whose intent could only be to discriminate on the basis of age constitute direct evidence." Clark v. Coats & Clark, Inc., 990 F.2d 1217, 1226 (11th Cir. 1992).

[3] Plaintiff makes reference in his brief to statistics produced by defendant regarding whom Pentastar laid off, although plaintiff does not rely on this evidence in this part of his argument. These statistics show only a breakdown by age of the thirty-seven employees laid off; they do not show the age of the relevant workforce, or what percentage of the workforce these individuals constituted. Nevertheless, the court will consider this evidence in the analysis of whether plaintiff proves defendants' reasons articulated for the layoff were a pretext for discrimination.

11

S.Ct. 2742, 125 L.Ed.2d 407 (1993).   The analytical framework

developed by that trilogy has three steps.   Although these cases

involved discrimination claims under Title VII, a variant of the

analysis applies to claims under the ADEA as well.  *See Mitchell v.*

*Worldwide Underwriters Ins. Co.*, 967 F.2d 565, 566 (11th Cir.

1992); *Alphin v. Sears, Roebuck & Company*, 940 F.2d 1497, 1500

(11th Cir. 1991).   The goal of the three-step process is that of

"progressively ... sharpen[ing] the inquiry into the elusive

factual question of intentional discrimination."  *St. Mary's Honor*

*Center*, 509 U.S. at 506, 113 S.Ct. at 2746 (*quoting Burdine*, 450

U.S. at 255 n.8, 101 S.Ct. at 1094 n.8).

### 1.   First Step of Analysis

Under this framework, the plaintiff bears the initial burden

of establishing a prima facie case of the employer's intent to

discriminate on the basis of age.  *McDonnell Douglas*, 411 U.S. at

802, 93 S.Ct. at 1824; *Burdine*, 450 U.S. at 252-53, 101 S.Ct. at

1093; *Hicks*, 509 U.S. at 506, 113 S.Ct. at 2746-47.

The establishment of a prima facie case "creates a presumption

that the employer unlawfully discriminated against the employee,"

*Burdine*, 450 U.S. at 254, 101 S.Ct. at 1094, and shifts to the

employer the burden of producing legitimate, non-discriminatory

12

reasons for the contested employment action. *Id.; McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. at 1824; *see also Walker v. Mortham*, 158 F.3d 1177, 1185 n.10 (11th Cir. 1998) (discussing reasons why presentation of a prima facie case creates "a presumption, and not an inference, of intentional discrimination." (emphasis in original)).

### 2.   Second Step of Analysis

The effect of the presumption of discrimination created by the establishment of a prima facie case is to shift to the employer the burden of producing, but <u>not proving</u>,[4] some legitimate, nondiscriminatory reason for the contested employment action. *See McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. at 1824; *Burdine*, 450 U.S. at 253, 101 S.Ct. at 1093. The Supreme Court described this shift in the burden of going forward with evidence in the following manner in *Hicks*:

> Thus, the *McDonnell Douglas* presumption places upon the defendant the burden of producing an explanation to rebut the prima facie case — *i.e.*, the burden of "producing

---

[4] *See, e.g.*, Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248, 254, 101 S.Ct. 1089, 1094, 67 L.Ed. 207 (1981) ("The defendant need not persuade the court that it was actually motivated by the proffered reasons."); *see also,* Isenbergh v. Knight-Ridder Newspaper Sales, Inc., 84 F.3d 1380, 1386 (11th Cir. 1996) ("This burden on the employer is one of production, not persuasion."); Busby v. City of Orlando, 931 F.2d 764, 77 n.12 (11th Cir. 1991) ("[T]his 'burden of proof' is to be understood as a burden of production, not persuasion.") (*citing* Wards Cove Packing Co. v. Atonio, 490 U.S. 642, 109 S.Ct. 2115, 104 L.Ed.2d 733 (1989)).

13

evidence" that the adverse employment actions were taken "for a legitimate, nondiscriminatory reason." ... "[T]he defendant must clearly set forth, through the introduction of admissible evidence," reasons for its actions which, if believed by the trier of fact, would support a finding that the unlawful discrimination was not the cause of the employment action. ... It is important to note, however, that although the *McDonnell Douglas* presumption shifts the burden of production to the defendant, "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff," .... In this regard it operates like all presumptions as described in Rule 301 of the Federal Rules of Evidence:

> "In all civil actions and proceedings not otherwise provided for by Act of Congress or by these rules, a presumption imposes on the party against whom it is directed the burden of going forward with evidence to rebut or meet the presumption, but does not shift to such party the burden of proof in the sense of the risk of nonpersuasion, which remains throughout the trial upon the party on whom it was originally cast."

*Hicks*, 509 U.S. at 506-07, 113 S.Ct. at 2747 (citations to *Burdine* omitted).

If a defendant figuratively sits on its hands, and offers no "admissible evidence which would allow the trier of fact rationally to conclude that the employment decision had not been motivated by discriminatory animus," *Burdine*, 450 U.S. at 257, 101 S.Ct. at 1096, then "the court must award judgment to the plaintiff as a matter of law ...." *Hicks*, 509 U.S. at 509, 113 S.Ct. at 2748.

14

> As then-Justice (now Chief Justice) Rehnquist pointed out
> long before the *Hicks* decision, we require a defendant,
> on pain of losing the case, to come forward with
> explanations for its actions once a plaintiff has made
> out a prima facie case of discrimination, "because we
> presume these acts, if otherwise unexplained, are more
> likely than not based on the consideration of
> impermissible factors." *Furnco Constr. Corp. v. Waters*,
> 438 U.S. 567, 577, 98 S.Ct. 2943, 2949-50, 57 L.Ed.2d 957
> (1978). ...

*Combs v. Plantation Patterns*, 106 F.3d 1519, 1537 (11th Cir. 1997),
cert. denied sub nom. *Combs v. Meadowcraft Co.*, ___ U.S. ___, 118
S.Ct. 685, 139 L.Ed.2d 632 (1998).

To satisfy that burden of production, "[t]he defendant need
not persuade the court that it was actually motivated by the
proffered reasons. It is sufficient if the defendant's evidence
raises a genuine issue of fact as to whether it discriminated
against the plaintiff." *Burdine*, 450 U.S. at 254-55, 101 S.Ct. at
1094 (citation and footnote omitted).

"If the defendant carries this burden of production, the
presumption raised by the prima facie case is rebutted," *Burdine*,
450 U.S. at 255, 101 S.Ct. at 1094-95, and "drops from the case."
*Id.* at 255 n.10, 101 S.Ct. at 1095 n.10; *accord, Hicks*, 509 U.S. at
507-08, 113 S.Ct. at 2747-48. "A satisfactory explanation by the
defendant destroys the legally mandatory inference of

15

discrimination arising from the plaintiff's initial evidence."
*Burdine*, 450 U.S. at 256 n.10, 101 S.Ct. at 1095 n.10.

### 3. Third Step of Analysis

"The defendant's 'production' (whatever its persuasive effect)
having been made," *id.*, 509 U.S. at 511, 113 S.Ct. at 2749, "the
factual inquiry proceeds to a new level of specificity." *Burdine*,
450 U.S. at 255, 101 S.Ct. at 1095. "[T]he 'new level of
specificity' ... refer[s] to the fact that the inquiry now turns
from the few generalized factors that establish a prima facie case
to the specific proofs and rebuttals of discriminatory motivation
the parties have introduced." *Hicks*, 509 U.S. at 516, 113 S.Ct. at
2752.

At this third level of analysis, the plaintiff must be
afforded the opportunity to discredit the defendant's proffered
explanations for the contested employment decision, and to show
that it is but a pretext for discrimination. "In other words, the
plaintiff has the opportunity to come forward with evidence,
including the previously produced evidence establishing the prima
facie case, sufficient to permit a reasonable factfinder to
conclude that the reasons given by the employer were not the real
reasons for the adverse employment action." *Combs v. Plantation*

16

*Patterns*, 106 F.3d 1519, 1528 (11th Cir. 1997) (citations omitted),
*cert. denied sub nom. Combs v. Meadowcraft Co.*, ___ U.S. ___, 118
S.Ct. 685, 139 L.Ed.2d 632 (1998); *see also Hicks*, 509 U.S. at 507-
08, 113 S.Ct. at 2747-48 ("The plaintiff then has the full and fair
opportunity to demonstrate, ... that the proffered reason was not
the true reason for the employment decision, ... and that race [or
age] was. He retains that ultimate burden of persuading the [trier
of fact] that [he] has been the victim of intentional
discrimination.") (citations to *Burdine* and internal quotation
marks omitted).

If the plaintiff succeeds in casting doubt upon the
credibility of the explanations put forward by the defendant — in
other words, "if there is sufficient evidence to demonstrate the
existence of a genuine issue of fact as to the truth of each of the
employer's proffered reasons for its challenged action" — then "it
follows from *Hicks* that a plaintiff is entitled to survive summary
judgment, and judgment as a matter of law...." *Combs*, 106 F.3d at
1529; *see also id*. at 1532 ("To summarize, ... this circuit's post-
*Hicks* decisions uniformly hold that once a plaintiff has
established a prima facie case and has put on sufficient evidence
to allow a factfinder to disbelieve an employer's proffered

17

explanation for its actions, that alone is enough to preclude [summary judgment or] entry of judgment as a matter of law.").

## B. Discriminatory Layoff

### 1. Prima facie case

When, as here, the employer produces evidence that it discharged plaintiff as part of a reduction in force (RIF), the plaintiff establishes a prima facie case by demonstrating:

(1) that he was in a protected age group and was adversely affected by an employment decision, (2) that he was qualified for his current position or to assume another position at the time of discharge, and (3) evidence by which a fact finder reasonably could conclude that the employer intended to discriminate on the basis of age in reaching that decision.

*Williams v. Vitro Services Corp.*, 144 F.3d 1438, 1441 (11th Cir. 1998) (footnote omitted).

#### a. Protected group and adverse employment action

Jack Simon was fifty-eight years of age when he was laid off. Thus, Simon was in the group protected by the ADEA, and he suffered an adverse employment action in being laid off. *See Verbraeken*, 881 F.2d at 1046.

#### b. Plaintiff's qualifications

Next, Simon must demonstrate that he was qualified for his position as Program Administration Manager, or qualified to assume another position at the time of discharge. This burden is light,

18

and Simon satisfies it by showing that in his nearly seven years at Pentastar he never received an evaluation rating his performance less than satisfactory. *See Baker v. Sears, Roebuck & Company*, 903 F.2d 1515, 1520 (11th Cir. 1990); *see also Owens v. New York City Housing Authority*, 934 F.2d 405, 409 (2d Cir. 1991). Moreover, Simon presents evidence demonstrating he was qualified for other positions at Pentastar as well.[5] (*See* Evans declaration, ¶ 2; plaintiff's deposition, at 70-74.)

### c.   Evidence of intention to discriminate

The final element Simon must show to establish a prima facie case is evidence by which a fact finder reasonably could conclude that Pentastar intended to discriminate on the basis of age in selecting him for layoff. It is undisputed that younger employees in Fletcher's support labor division, including some below the age of forty (and outside of the protected class), were retained while defendant was laid off. Certain employees soon thereafter began to perform jobs similar to Simon's former job, and younger employees were retained in positions for which Simon was qualified. Simon satisfies his burden. *See Branson v. Price River Coal Co.*, 853

---

[5] Thus, even if the court were to find that Simon's position was eliminated, Simon still satisfies this element of the prima facie case. *See* Earley v. Champion International Corp., 907 F.2d 1077, 1083 (11th Cir. 1990).

19

F.2d 768, 771 (10th Cir. 1988); *see also Jameson v. The Arrow Company*, 75 F.3d 1528, 1532 (11th Cir. 1996) ("It is undisputed that job openings for which Jameson was qualified existed at the time [her job was eliminated in the RIF], and that Arrow hired younger employees to fill these vacancies. We hold that [these facts] could give rise to a rebuttable inference that [Arrow] intended to discriminate against Jameson on the basis of age."); *Benson v. Tocco, Inc.*, 113 F.3d 1203, 1209 n.4 (11th Cir. 1997) (suggesting low standard for initially showing evidence of intentional age discrimination that satisfies the third element of a prima facie case in a RIF situation); *Maddow v. Procter & Gamble Company, Inc.*, 107 F.3d 846, 851 (11th Cir. 1997) (same); *cf. Elrod v. Sears, Roebuck & Company*, 939 F.2d 1466, 1470 (11th Cir. 1991) (satisfying burden in ADEA discharge case not involving a RIF).

## 2. Reasons articulated by defendants for layoff.

After Simon has established a prima facie case, the burden of production shifts to defendants, who must articulate at least one legitimate, non-discriminatory reason for discharging plaintiff. *See, e.g., Watkins v. Sverdrup Technology, Inc.*, 153 F.3d 1308, 1314 (11th Cir. 1998).

It is undisputed that a downturn in business prompted the RIF to which Simon fell victim. Excessive support labor costs led Pentastar, and Fletcher specifically, to target the Program Management Office in an effort to reduce cost overruns. In essence, defendants contend Pentastar chose Simon to lay off because his skills were not unique and his salary was one of the highest in the group targeted for the RIF. Explaining the decision in his deposition, Fletcher said he chose Severin Breding and Simon to lay off because "[t]hey are the two highest paid persons in there. The work they were doing I could do and I wouldn't lose a unique skill that nobody else had." (Fletcher deposition, at 24.) Defendants also say that three of the four employees in Simon's department had unique skills and consequently were more efficient than Simon. Simon admitted he was less efficient at inputting data because he lacked familiarity with the computer program. (*See* plaintiff's deposition, at 69-70). In addition, defendants argue that other employees in the department were not laid off because they were assigned to high priority contracts at the time of the RIF.

Defendants have met their burden. *See, e.g., Broaddus v. Florida Power Corporation*, 145 F.3d 1283, 1287 (11th Cir. 1998).

21

### 3.   Plaintiff's burden to show reasons are a pretext for discrimination

Plaintiff's ensuing burden of proving that the defendants'

proffered explanations are pretextual can be met by

> "...showing that a discriminatory reason more likely than
> not motivated the employer's decision, or by discrediting
> the employer's proffered explanation." Clark v. Coats &
> Clark, Inc., 990 F.2d 1217, 1228 (11th Cir. 1993). Under
> the latter approach, plaintiff must demonstrate "such
> weaknesses,     implausibilities,     inconsistencies,
> incoherencies, or contradictions in the employer's
> proffered legitimate reasons for its action that a
> reasonable factfinder could find [all of those reasons]
> unworthy of credence." Combs v. Plantation Patterns, 106
> F.3d 1519, 1538 (11th Cir. 1997) (internal quotation
> marks and citation omitted).

Watkins, 153 F.3d at 1314.

Jack Simon points to one age-related comment and an alleged

pattern of discriminatory conduct in his attempt to demonstrate

that defendants' proffered reasons for his layoff were a pretext

for age discrimination.

### a.   Age-related comment

Generally, courts look to two factors in determining whether

a comment has any probative value as to an employer's intent behind

a given employment action:  (1) who uttered the comment; and (2)

the content and context of that comment.[6]  In essence, the comment

---

[6] Although the second factor listed is more often considered in analyzing
whether a comment constitutes "direct evidence" of discrimination, "once the

22

must have been uttered by a decisionmaker involved in the challenged employment action to have any bearing at this stage of the analysis. *See Mauter v. The Hardy Corporation*, 825 F.2d 1554, 1558 (11th Cir. 1987) (finding affidavit recounting statements by company vice president alleging discriminatory animus behind the company's employment decisions "too attenuated" to present a genuine issue of material fact in pretext analysis where vice president "played no part in the decision to terminate the plaintiff"); *Holifield v. Reno*, 115 F.3d 1555, 1563-64 (11th Cir. 1997) ("The biases of one who neither makes nor influences the challenged personnel decision are not probative in an employment discrimination case."). Moreover, the comment must pertain to the challenged action, the plaintiff, or a situation involving the plaintiff, at least in some general sense. *See Enters v. City of Delphi*, 123 F.3d 956, 973 (7th Cir. 1997) ("Evidence of discriminatory motives must, it is true, have some relationship with the employment decision in question."); *Cf. Carter v. Three Springs Residential Treatment*, 132 F.3d 635, 642 (finding no direct

---

defendant has met its burden of production, the *McDonnell Douglas/ Burdine* framework becomes irrelevant; the sole inquiry is whether the plaintiff successfully carries the burden of persuading the trier of fact that the defendant engaged in intentional discrimination on the basis of a prohibited factor." Walker v. NationsBank of Florida, 53 F.3d 1548, 1557 (11th Cir. 1995).

23

evidence of discrimination where statement "does not relate directly to the [challenged] decision"); *Price Waterhouse v. Hopkins*, 490 U.S. 228, 277, 109 S.Ct. 1775, 1804, 104 L.Ed.2d 268 (1989) (O'Connor, J., concurring) ("[S]tray remarks in the workplace ..., statements by nondecisionmakers, or statements by decisionmakers unrelated to the decisional process itself" do not constitute direct evidence of discrimination).

The comment Simon cites to demonstrate a discriminatory animus on the part of defendants allegedly was uttered by Paul Gulbis, who was a Senior Vice President with Pentastar at the time of his alleged remark. Simon offers evidence of this utterance in the form of the Hicks declaration.

> In my office on December 16, 1996, Gulbis was returning from the office of Jewell Toney to request that a drafting checker be offered a job. In my presence, Gulbis informed Mr. Walt Buie, the head of the Mechanical Engineering Department, that a contracting job would not be forthcoming for Cliff Beaty. Beaty was a sixty year old man who had accepted a retirement package, but who was still employed as a Chrysler Corporation checker in Buie's department. In referring to Beaty, Gulbis stated, "He said he is too God-Damn old, and I want a younger person in that position."

(Hicks declaration, ¶ 6.) For purposes of this motion, the court assumes Gulbis made this statement, and that the substance of the

24

statement was in fact true.[7]    See Mauter, 825 F.2d at 1558.

Moreover, the court will interpret this statement in a light most favorable to Simon: i.e., as "[Toney] said [Beaty] is too God-Damn old, and [Toney] want[s] a younger person in that position."[8]

This statement was a single statement and was not made to or directed at Simon, and Simon has no personal knowledge of the statement.    Moreover, the context of the statement in no way involved Simon.  Rather, the statement was uttered in a discussion about a potential job for someone who then was a Chrysler employee, and who "was a sixty year old man who had accepted a retirement package."  Furthermore, the person who made the decision directly affecting Simon was Fletcher.[9]  No evidence suggests Fletcher had

---

[7]  The court may consider this statement over defendants' objection on hearsay grounds, because the affiant identifies specific individuals who may be subpoenaed for testimony at trial.  See, e.g., United States v. Four Parcels of Real Property in Greene and Tuscaloosa Counties, 941 F.2d 1428, 1444 (11th Cir. 1991) ("The nonmoving party ... need not 'produce evidence in a form that would be admissible at trial ... to avoid summary judgment'; instead, its evidence must be 'reduc[ible] to admissible evidence.'") (quoting Celotex, 477 U.S. at 324, 327, 106 S.Ct. at 2553, 2555); see also Pritchard v. Southern Co. Services, 92 F.3d 1130, 1135 (11th Cir. 1996) ("It is true that inadmissable hearsay may sometimes be considered by a court when ruling on a summary judgment motion. ... However, Pritchard cannot use inadmissable hearsay to defeat summary judgment when that hearsay will not be reducible to admissible form at trial.") (internal citations omitted).

[8]  The court finds this reading comports with the apparent intention of the affiant, but notes the ambiguity engendered by the introductory phrase.

[9]  It is undisputed that Toney allowed Fletcher complete control over the means by which he reduced costs and, therefore, over the employees he subjected to the RIF.  Toney did make the ultimate decisions based on Fletcher's recommendation, however.  Nevertheless, any connection from these remarks made

25

any knowledge of either Gulbis' statement, the initial, allegedly "ageist" statement, or of any other discriminatory animus.

Accordingly, the court finds this statement has no bearing on the determination of whether defendants' legitimate, nondiscriminatory reasons for the layoff were pretextual.

### b.  Discriminatory pattern of conduct

Other discriminatory acts of an employer can be relevant to that employer's motive or intent in a particular employment decision. *See Hogan v. American Telephone & Telegraph Co.* 812 F.2d 409, 410 (8th Cir. 1987); *see also Aman v. Cort Furniture Rental Corporation*, 85 F.3d 1074, 1086 (3rd Cir. 1996) ("Evidence of discrimination against other employees ... is relevant to whether one of the principal non-discriminatory reasons asserted by [an employer] for its actions was in fact a pretext for ... discrimination.") (internal quotation marks omitted) (collecting cases from other circuits); *Stanfield v. Answering Service, Inc.*, 867 F.2d 1290, 1294 (11th Cir. 1989).

Courts stress that evidence of other allegedly discriminatory acts "must assist in the development of a reasonable inference of discrimination within the context of each case's respective facts."

---

in an entirely different context, to Fletcher's recommendation of the reorganization of his department, is too attenuated.

26

*Callanan v. Runyun,* 75 F.3d 1293, 1298 (8th Cir. 1995). For example, in *Stanfield* the Eleventh Circuit found that, in addition to evidence directly challenging the employer's articulated reason, evidence of plaintiff's immediate supervisor's pattern of hiring persons under the age of forty, including plaintiff's replacements, was sufficient to create a genuine issue of material fact in the pretext analysis. 867 F.2d at 1293; *see also Duckworth v. Ford,* 83 F.3d 999, 1001 (8th Cir. 1996) (stating that the district court properly admitted "[e]vidence that [the employer] had retaliated against someone else at about the same time and under similar circumstances" because such evidence is of the kind "from which the jury could reasonably infer that [the employer] had a similar motive or intent to retaliate against [the plaintiff]") (emphasis supplied). On the other hand, if the circumstances of the challenged action are sufficiently distinct from those involved in the other acts, then the evidence of these other acts cannot lead to a finding of discrimination. *See Hogan,* 812 F.2d at 411; *see also Kypke v. Burlington N.R. Co.,* 928 F.2d 285, 287 (8th Cir. 1991) (circumstantial evidence that demonstrated only an age differential did not generate an inference of age discrimination). Upholding the district court's exclusion of evidence of other

27

discriminatory acts in *Callanan*, the Eighth Circuit elucidated this

distinction:

> To begin with, the excluded testimony in this case,
> unlike the statistical evidence and specific factual
> allegations involved in our earlier decisions, *see, e.g.,*
> *Estes,* 856 F.2d at 1102-04, consisted largely of
> generalized, subjective assertions of a perceived bias in
> operations at the [employer's] facility. Moreover, to
> the extent that the testimony did identify discrete acts
> of discrimination, the witnesses did not complain that
> Callanan's own supervisors had engaged in any behavior
> that we could correctly characterize as improper. *Cf.*
> *id.* at 1104 (mentioning that evidence of an employer's
> past discriminatory acts may not be probative where the
> employees involved in the improper activity were
> unconnected with the employees who discriminated against
> the complainant).[10]

*Callanan,* 75 F.3d at 1298 (emphasis supplied).

## (1) Affidavits of other employees

Evidence of other discriminatory acts can be in the form of

affidavits of other employees, alleging their own personal

knowledge of actions similar to the ones in issue. *See Carter v.*

*Three Springs Residential Treatment,* 132 F.3d 635, 644-45 (11th

Cir. 1998). Clearly, the effect of such evidence depends on how

related or how similar the alleged other acts are to the ones in

issue. In *Carter,* the plaintiff submitted at least ten affidavits

---

[10] The court went on to stress that "the evidentiary ruling in this case
was not the type of blanket pretrial exclusion that we have in the past viewed
with such skepticism." 75 F.3d at 1298.

of former employees. According to the Eleventh Circuit, the district court properly struck "[m]ost of the affiants' statements [which] contain[ed] conclusory and generalized allegations of [a discriminatory] bias." 132 F.3d at 642. The court found, however, that the district court erred in striking certain affidavits of employees attesting to their respective experiences with the defending employer.[11] These attestations recounted very specific

---

[11] The court found that, in addition to other evidence, these affidavits constituted circumstantial evidence in support of plaintiff's argument that the reasons defendant articulated were pretextual.

> Additionally, several affidavits improperly stricken by the district court related instances of alleged disparate treatment that could be relevant to a trier of fact in evaluating Three Springs' motives. For example, Tyrone Bowling, a former Counselor Aide (the position plaintiff held), recounted an incident involving Cook (plaintiff's supervisor):
>> I has [sic] a problem with respect to Ms. Cook in that there was an incident in which I was disciplined as a result of my talking with one of the adolescents about religion. This led to my termination, but a similarly situated white employee engaged in the same contact was not disciplined in any fashion.
>
> Gregory Jones, an activity specialist, stated that he "was involved in an incident involving a written reprimand for a situation dealing with the escape of one of the adolescents, but a white employee, who also had the same offense, was not provided any written reprimand." Samuel Brewer, a Counselor Aide, stated that Carter and he "were paid less in [their] positions than other non- minorities who had lesser educational degrees." Ronnie Johnson, Counselor Aide, stated that he was asked "to be involved in the direct monitoring of another black ... employee in order to help assist management in getting information on this black employee so that they could terminate this person." Given the foregoing, Carter produced evidence that, if believed, could be found to cast doubt on the credibility of the reasons stated by Three Springs for hiring Haynes instead of Carter.

*Carter*, 132 F.3d 644-45.

29

occurrences. One affiant described problems he had with plaintiff's supervisor, who was a decisionmaker in the actions plaintiff challenged. Another affiant attested to his involvement in a situation similar to the sole situation in which plaintiff received a reprimand, and to the discriminatory disciplinary measures taken in the affiant's situation. Another former employee who held the same position as plaintiff stated that they "were paid less in [their] positions than other non-minorities who had lesser educational degrees." *Id.* at 645.

In a case where the evidence had a more tenuous link to the plaintiff's situation, *Callanan*, the Eight Circuit affirmed the district court's exclusion of testimony of individuals who had attested to acts of discrimination that they were subjected to as employees of the defendant. The court noted that "none of these persons worked [in the same position plaintiff held] or claimed that [plaintiff's] supervisors had engaged in discriminatory conduct." 75 F.3d at 1297.

In the case at bar, Jack Simon submits the declaration of Donald G. Hicks to demonstrate other acts of defendants discriminating on the basis of age. Hicks declares he has personal knowledge of six employees over age fifty who were replaced by

30

younger individuals, all of whom save one were over the age of forty but not fifty. Simon and Hicks himself were two of these six. Other than attesting to Simon possessing a more impressive educational background than his alleged replacement and Hicks possessing greater breadth of experience than his replacement, Hicks offers merely the following comparative statement for all the other employees named: "During 1996, other older employees of Chrysler were replaced by younger co-workers with less experience and qualifications." (Hicks declaration, ¶ 3.)

First, these subjective, conclusive statements comparing Simon and Hicks with their respective replacements are unpersuasive. *See Branson*, 853 F.2d at 771-72. Furthermore, the declaration does not suggest that Michol Fletcher, Simon's supervisor and the decisionmaker in the employment action Simon challenges, had any involvement with the layoffs of anyone other than Simon.[12] Moreover, only one of the employees named appears to have worked in the same general "support labor" side of the business as Simon.[13]

---

[12] Nor does the declaration suggest that Jewell Toney had any involvement in such decisions.

[13] Incidentally, this one individual appears to be Fletcher, the decisionmaker who decided Simon should be laid off.

31

Accordingly, the court finds this evidence insufficient to cast doubt upon defendant's legitimate, nondiscriminatory reasons and thereby create an issue of fact.

### (2) Statistical evidence

Of the three forms of proof, statistical evidence has the least probative value in cases prosecuted by individual plaintiffs. The Eleventh Circuit holds that "statistics alone cannot make a case of individual disparate treatment." *Carter v. Three Springs Residential Treatment*, 132 F.3d 635, 642 n.5 (11th Cir. 1998) (quoting *Carmichael v. Birmingham Saw Works*, 738 F.2d 1126, 1131 (11th Cir. 1984) (distinguishing individual cases from class action cases where statistics, if strong enough, can carry the plaintiff class' initial burden of production in the establishment of a *prima facie* case) (internal quotation marks omitted)). *See also Combs v. Plantation Patterns*, 106 F.3d 1519, 1527 n.3 (11th Cir. 1997) (rejecting plaintiff's statistical evidence as "undeveloped and without analytical foundation"), *cert. denied sub nom. Combs v. Meadowcraft Co.*, ___ U.S. ___, 118 S.Ct. 685, 139 L.Ed.2d 632 (1998); *Brown v. American Honda Motor Co.*, 939 F.2d 946, 952-53 (11th Cir. 1991) (noting that statistics without analytic

32

foundation are "virtually meaningless"), *cert. denied*, 502 U.S. 1058, 112 S.Ct. 935, 117 L.Ed.2d 106 (1992).

A plaintiff must present evidence that is "statistically significant" in order for it to be probative of an employer's intent to discriminate.[14] *See Watkins*, 153 F.3d at 1315-16. The evidence must control variables sufficiently to lend some insight into the motivation behind a particular decision. For example, the proffered evidence must control for the job category of the employees included in the survey. *See Eastland v. Tennessee Valley Authority*, 704 F.2d 613, 625 (11th Cir. 1983) ("Given the weakness of the theoretical foundation and the failure to control for the job category, the district court did not err in determining that [the statistical evidence was] insufficient to establish a prima facie case."). Moreover, at the final stage of analysis, the evidence must take into account the reasons the employer has articulated for the challenged action. *See Furr v. Seagate Technology, Inc.*, 82 F.3d 980, 987 ("Statistical evidence which fails to properly take into account nondiscriminatory explanations does not permit an inference of pretext.")

---

[14] There is no guarantee that even statistically significant evidence will create a jury question of pretext. *See Watkins*, 153 F.3d 1315 n.15.

33

Jack Simon presents only the age comparison of employees whom Pentastar laid off in the RIF. Simon presents no evidence of the average age of the workforce at this time.[15] Simon presents no evidence of the average age of his department either. Furthermore, Simon relies on the fact that 79% of those laid off were over the age of forty. If Simon were to use the same age group (over age fifty) he used when comparing those replaced by younger employees, however, the percentage of older employees laid off drops to roughly 33%. Nevertheless, Simon still fails to present an average age of the workforce or any evidence specific to his department, rendering these statistics meaningless. The statistical evidence proffered in this case does not aid Simon in his effort to demonstrate pretext. *See Doan v. Seagate Technology, Inc.*, 82 F.3d 974, 979 (10th Cir. 1996) (finding plaintiff's data that "a greater percentage of older workers were selected for the RIF while a greater percentage of younger people were hired afterwards" to be "flawed because it failed to compare similarly situated individuals and failed to eliminate nondiscriminatory reasons for the numerical

---

[15] Pentastar may have had a much greater percentage of older employees than younger employees, which would lead one to expect a higher percentage of the employees laid off to be older. In fact, Simon asserts that potential purchasers of Pentastar had expressed concern over the age of Pentastar's workforce. (*See* plaintiff's brief, at 5.)

34

disparities"); *cf. Barnes v. Southwest Forest Industries, Inc.*, 814 F.2d 607, 608, 610 (11th Cir. 1987) (finding insufficient circumstantial evidence to support a prima facie case of failing to retain or rehire on the basis of age, even though employer discharged fourteen security guards in a RIF--thirteen of whom were over the age of forty--and hired twelve employees just before the RIF-- only one of whom was over the age of forty).

Simon's efforts to show that defendants' stated reasons for his layoff were a pretext for age discrimination, individually and collectively, fail to permit a reasonable inference that his layoff was motivated by intentional age discrimination. *See generally LaMontagne v. American Convenience Products, Inc.*, 750 F.2d 1405, 1413 (7th Cir. 1984). Accordingly, defendants' motions are due to be granted for this claim.

## C. Discriminatory Refusal to Transfer

In his brief, Simon alludes to an unsuccessful attempt to obtain employment at Accustar, Inc., another subsidiary of Chrysler, as the only circumstance which may give rise to a failure to transfer claim.[16] As a threshold inquiry, the court must

---

[16] To establish a prima facie case on a failure to transfer claim under the ADEA, the plaintiff ordinarily must show "(1) he is a member of a protected class; (2) he applied for and was denied a position for which he was qualified; and (3) the position was given to a significantly younger person." *Kehoe v.*

35

determine whether the scope of Simon's charge of discrimination filed with the EEOC includes a claim for this alleged failure to transfer involving Accustar.[17]

The Eleventh Circuit defines the scope of a discrimination action as

> encompass[ing] any kind of discrimination like or related to allegations contained in the [EEOC] charge and growing out of such allegation during the pendency of the case before the commission." In other words, the "scope" of the judicial complaint is limited to the "scope" of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination.

*Turner v. Orr*, 804 F.2d 1223, 1225-26 (11th Cir. 1986) (quoting *Sanchez v. Standard Brands, Inc.*, 431 F.2d 455, 466 (5th Cir.1970)).

Jack Simon alleged age discrimination in a laundry list of employment actions: "discharge, layoff, transfer, promotion, recall and other terms, conditions and privileges of employment." (Plaintiff's deposition, exhibit 1.) Simon then described particular instances, mentioning only the layoff, his "replacement," and the recall. Furthermore, Simon listed "Chrysler Corporation" and "Pentastar Electronics, Inc, [sic] A Chrysler

---

Anheuser-Busch, Inc., 96 F.3d 1095, 1104 (8th Cir. 1996).

[17] The court's consideration of the EEOC charge is prompted by Chrysler's argument in brief. (*See* Chrysler's brief in support, at 12-13.)

36

Company" as the employer, providing the same address and phone number for each. Simon does not mention Accustar, Inc. or an attempt to transfer. Rather, the only mention of any such action is found in the laundry list of adverse actions.

Accustar and Pentastar are separate entities, with the only commonality in the ownership of stock. The entities maintain separate facilities, separate management, and a separate work force. No evidence suggests any availability of job transfers between these entities.

Given this lack of an apparent connection between Pentastar and Accustar, the failure to mention Accustar on the charge, and the general reference to failure to transfer, the court finds the failure to transfer claim does not fall within the "scope" of the EEOC investigation which could reasonably be expected to grow out of Simon's charge of discrimination.[18] *See Hamm v. Board of Regents of the State of Florida,* 708 F.2d 647, 650 (11th Cir. 1983) (affirming district court's dismissal where it was "not at all clear ... that the scope of an EEOC investigation which could have

---

[18] It is of some note that Simon himself did not believe he had brought a claim for the situation at Accustar. (*See* plaintiff's deposition, at 130-31). In addition, plaintiff does not seek redress for other discriminatory actions included on the laundry list in the charge: *e.g.,* discharge, promotion, and "other terms, conditions and privileges."

37

reasonably grown out of this administrative charge would have included the DOA or the Board of Regents").

Accordingly, defendants' motions are due to granted for this claim.

**D. Discrimination in the Recall**

The court finds genuine issues of material fact exist as to whether Simon suffered age discrimination in his placement at PEI upon recall. Genuine issues of fact exist in determining whether Simon's former position was in fact eliminated and whether his placement into his current position was an adverse employment action. The issues mentioned above are not intended to be an exhaustive list. Nevertheless, summary judgment is inappropriate for this claim.

**IV. CONCLUSION**

Accordingly, defendant's motion is due to be granted in part and denied in part. A separate order consistent with this memorandum opinion will be entered contemporaneously herewith.

**DONE** this $\underline{8^{th}}$ day of February, 1999.

United States District Judge

38